IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * *    15CR10146-NMG
UNITED STATES OF AMERICA*
                         *
VS.                      *    APRIL 26, 2017
                         *    3:11 P.M.
WILLIE BERRY             *
                         *
* * * * * * * * * * * *    BOSTON, MA


BEFORE THE HONORABLE NATHANIEL M. GORTON

DISTRICT JUDGE

(Sentencing)


**APPEARANCES**:


FOR THE GOVERNMENT:    EMILY O. CANNON, AUSA
                       US Attorney's Office
                       J. Joseph Moakley US Courthouse
                       1 Courthouse Way, Suite 9200
                       Boston, MA 02210

FOR THE DEFENDANT:     DAVID J. APFEL, ESQ.
                       TIMOTHY KISTNER, ESQ
                       Goodwin Procter, LLP
                       100 Northern Avenue
                       Boston, MA 02210

Court Reporter:        Debra D. Lajoie, RPR-FCRR-CRI-RMR
                       1 Courthouse Way
                       Boston, MA  02210


Proceeding reported and produced
by computer-aided stenography

1    26 APRIL 2017 -- 3:11 P.M.

2        THE CLERK:  This is Criminal Action

3    No. 15-10146, the United States of America v.

4    Willie Berry.

5        Will Counsel please identify themselves for the

6    record.

7        MS. CANNON:  Good afternoon, Your Honor.

8    Emily Cannon on behalf of the United States.

9        THE COURT:  Good afternoon, Ms. Cannon.

10        MR. APFEL:  Good afternoon, Your Honor.

11    David Apfel, with me is Timothy Kistner from my

12    officer, on behalf of Mr. Willie Berry.

13        THE COURT:  Mr. Apfel, Mr. Kistner, Mr. Berry,

14    good afternoon.

15        We have Ms. Marcy from Probation.  Good

16    afternoon to her.

17        We're here on the sentencing of Mr. Willie

18    Berry, and I have received and read the pre-sentence

19    report; the Defendant's sentencing memorandum to which

20    is attached a group of letters, I believe there are 13

21    in all, in support of the Defendant from his

22    significant others, children, children of significant

23    others, his mother and his grandmother; I've also

24    received and read the Government's sentencing

25    memorandum.

1      And those are all the writings that I've

2  received.  Is there anything I haven't mentioned that I

3  should have received, Ms. Cannon?

4      MS. CANNON:  Your Honor, I think there was a

5  preliminary order of forfeiture that was submitted.  It

6  was filed with the Court.

7      THE COURT:  All right.  Would you refresh my

8  memory as to what that preliminary order of forfeiture

9  says?

10      MS. CANNON:  It's just to forfeit an Infiniti as

11  well as a phone that was seized.  It's set forth in the

12  plea agreement.  I had provided the Clerk with my copy,

13  unfortunately, Your Honor, so I don't have it.

14      THE COURT:  All right.  When we get to it, I

15  will impose the appropriate forfeiture.  I guess

16  Mr. Apfel has a copy.

17      MR. APFEL:  I can hand up a copy.

18      THE COURT:  I think Ms. Patch has it.  I guess

19  we do have the copies.  Thank you.

20      All right.  Anything that I haven't mentioned

21  that I should have received from your side, Mr. Apfel?

22      MR. APFEL:  I don't believe so, Your Honor.

23      THE COURT:  All right.  Then, I understand that

24  there is a very substantive argument about where the

25  Court should end up in this (c) plea.  Usually of

1     course (c) pleas don't have the flexibility that this

2     one does. This (c) plea that you entered into, I am

3     mindful that Counsel have negotiated such a binding

4     (c) plea that calls for a sentencing range the high end

5     of which is well below the Guideline range calculated

6     by the Probation Officer in the pre-sentence report and

7     is even at the low end of the Guideline range that

8     would apply if I were to sustain Defendant's

9     substantive objections to the pre-sentence report with

10     respect to the criminal history points assigned to the

11     Defendant. So, I am cognizant of that before we start.

12         However, we do need to resolve the objections

13     that are made to the pre-sentence report and then

14     establish the appropriate Guideline findings, and then

15     I will hear recommendations from Counsel. I do

16     understand that there are several objections, actually

17     ten, I believe it is -- 12 by the Defendant with

18     respect to the pre-sentence report.

19         I'm going to go through those, and I'll hear you

20     to the extent that you wish to supplement your

21     objections, Mr. Apfel, but as I understand it,

22     Objection No. 1 has been taken care of by the Probation

23     Officer 's response.

24         Objection No. 2 is informational. It's

25     something that the Defendant objects to having been

1    included in the pre-sentence report, but it has no

2    bearing on the established offense level, so I'm

3    calling it informational.

4        MR. APFEL:  Your Honor, may I interrupt for a

5    second?

6        THE COURT:  Yes.

7        MR. APFEL:  I think I can short-circuit this a

8    little bit.  We would -- I'm happy to address any of

9    the objections, but the ones that -- and I don't waive

10   any of the objections, but there really are two

11   objections.

12       THE COURT:  Well, I'm going to go through them,

13   Mr. Apfel.  I'm going to get to them, and then I'll let

14   you address any of the ones that you want, but I want

15   to state on the record what I feel each of the 12

16   objections is aiming at and whether they're

17   informational or substantive.  Then, after that, you

18   can argue anything you want.

19       MR. APFEL:  I believe the second one is

20   informational as presented, but I would like to pursue

21   it in the form of a motion to strike.

22       THE COURT:  Well, you can do that, but I'm going

23   to go through first and make my rulings, and then I'll

24   allow you to go back.

25       MR. APFEL:  Okay.

1          THE COURT:  All right.  I understand Objection

2    No. 2 to be informational and not substantive.

3          I understand the third objection to be the same,

4    informational.

5          I understand Objection No. 4 to have been partly

6    acknowledged by the Probation Officer but otherwise

7    informational.

8          I understand Objection No. 5 to have been partly

9    corrected by the Probation Officer but otherwise

10   informational.

11         And then, Objections 6 and 7 were simply

12   informational.

13         Objection No. 8 is -- has been partly corrected

14   but is otherwise informational.

15         And then we get to Objections No. 9, 10 and 11,

16   which are substantive based upon alleged scoring

17   discrepancies with respect to certain of the crimes for

18   which the Defendant was convicted.  Those are

19   substantive objections, 9 and 10.

20         11 is derivative on 9 and 10.

21         And Objection No. 12 is basically a motion for a

22   downward departure.

23         That's how the Court sees them.  I'll allow you

24   to address any of those objections, Mr. Apfel.

25         MR. APFEL:  Your Honor, I believe you've

1    accurately characterized the objections.

2         With regard to Objection 2, as I forecast a few

3    moments ago, that is an objection that largely pertains

4    to what I consider to be improper references in the

5    pre-sentence report to Mr. Berry having been a member

6    of a violent gang and, you know, as well as a leader of

7    a violent gang.

8         We have not seen, nor does the pre-sentence

9    report contain, anything that would come anywhere close

10   to admissible evidence, but we have not seen anything

11   that supports the conclusory contention of the

12   Government that is made in various paragraphs in the

13   pre-sentence report, repeated in the Government's

14   memorandum, that Mr. Berry is a member of the so-called

15   Columbia Point Dawgs, let alone that he has been one of

16   the leaders of that gang for years.

17        And I think this is important because, to the

18   extent that these references remain in the pre-sentence

19   report and they are based on not even so much police

20   reports; they're based on something that some police

21   officer said to the Probation Officer, they --

22        THE COURT:  Well, the Probation Officer is not

23   prevented from including hearsay in pre-sentence

24   reports, is she?

25        MR. APFEL:  Oh, I know that she's not precluded

1    from putting --

2              THE COURT:  I mean, I'm looking at her --

3              MR. APFEL:  I agree with that.

4              THE COURT:  I'm looking at her response to your

5    Objection No. 2, and she says, among other things, at

6    the top of Page 60, that law enforcement officials have

7    identified Defendant as a leader of the Columbia Point

8    Dawg gang.  In particular, a Detective Greg Brown has

9    been investigating Columbia Point and other varied

10   gangs for 20 years and is familiar with the Defendants

11   charged in this case, including Berry, and he advises

12   that the Boston Police Department Gang Unit has

13   documented Berry as a Columbia Point Dawg gang member,

14   et cetera, et cetera.

15             MR. APFEL:  I agree.  I mean, that's what it

16   says.  And I'm sure that Officer Brown, if he were

17   here, would say that he believes Mr. Berry is a member

18   of that gang and that, for all I know, he has some

19   documentation suggesting that his beliefs have been

20   reduced to writing.  We've never seen those documents.

21             THE COURT:  Nor is he required to give you those

22   for the Probation Officer to include it as part of the

23   narrative in the pre-sentence report.

24             MR. APFEL:  The reason I'm concerned is that

25   this pre-sentence report goes with Mr. Berry to prison.

1    No matter how you slice it, he's going to end up being

2    in Bureau of Prisons' control for a long period of

3    time, and this is going to affect his placement, it's

4    going to affect the programs that he's eligible for.

5    And to the extent that it really doesn't have a

6    foundation in reality, it's just not fair to the man to

7    subject him to these allegations.

8         And I would suggest that, although the case is

9    not directly on point, the Supreme Court's decision in

10   *United States v. Shepherd*, which indicates that, for

11   purposes of finding a predicate for a -- you know, for

12   an armed career felon, a Court cannot rely on a police

13   report for that, you know, for that conclusion.

14        I would suggest that an extension, a natural

15   extension of *US v. Shepherd*, which is 544 US 13, it's a

16   2005 decision, the natural extention is that, in a

17   pre-sentence report, to the extent that inflammatory

18   allegations are made that are going to have a real

19   impact on a person's life for the better part of the

20   next decade, that they need to be supported by

21   something other than totem pole hearsay.

22        And here, we haven't seen anything -- and even

23   the comments, as documented in the pre-sentence report

24   that purportedly come from Officer Brown, those suggest

25   that his basis for thinking that Mr. Berry is a member

1   of this gang is because he's seen him in the presence

2   of other people who he believes to be gang members and

3   not because he has any evidence that Mr. Berry himself

4   is a gang member, or they mention a You Tube video in

5   which Mr. Berry is singing a song with other people who

6   are wearing paraphernalia that somehow is associated

7   with the gang, but there's no suggestion that Mr. Berry

8   is wearing any such paraphernalia.

9           That's just not good enough, and it certainly is

10  in conflict with, if not the letter, certainly the

11  spirit of *US v. Shepherd*, and I would ask that those

12  references be struck because of the impact that it's

13  going to have on this man's life.  It comes at no cost

14  to the Government, it doesn't affect any other

15  arguments but has a real effect on what, you know, what

16  he's going to -- the life he's going to have for the

17  next seven, eight, nine, ten years.

18          THE COURT:  Ms. Cannon?

19          MS. CANNON:  Your Honor, the Government always

20  finds itself in an odd situation when defense counsel

21  comes in and, despite being present for multiple

22  interviews where Mr. Berry himself made references to

23  Columbia Point, violence that he was a part of

24  involving Columbia Point --

25          MR. APFEL:  Objection, Your Honor.  Objection.

1    May I be heard on that?

2              THE COURT:  Your objection is overruled.

3              MR. APFEL:  This is an improper argument.

4              THE COURT:  Mr. Apfel, please sit down.

5    Your objection is overruled.

6              MR. APFEL:  It's an improper argument --

7              THE COURT:  I will decide that.

8              MR. APFEL:  -- Your Honor, based on an improper

9    source.

10             THE COURT:  I will decide that.

11             MR. APFEL:  And she knows so.

12             THE COURT:  Go ahead.

13             MS. CANNON:  What I know is that defense counsel

14   has represented his client is not a part of a gang and

15   these are bald-faced accusations based on nothing,

16   which is in direct contradiction to interviews that

17   Mr. Apfel and I have been a part of with Detective

18   Brown on numerous occasions as well as many other

19   detectives.

20             Mr. Berry was a member and a leader of the

21   Columbia Point Dawgs for a very long time, as was his

22   brother, as were many family members of his.  He has

23   been a part of numerous acts of violence because of his

24   membership and leadership in the Columbia Point Dawgs,

25   of which Mr. Apfel is very familiar, one being the

1   kidnapping of his younger brother, Vandell Woods, and

2   resulting in violence that involved shootings and

3   murders, none of which we're alleging Mr. Berry was

4   responsible for at this point in time but that  he's

5   been present for numerous conversations about.  So,

6   it's very tricky to be in the Government's  position

7   to accurately respond to these allegations that

8   these are nothing more than fluff pieces from Detective

9   Greg Brown while trying to maintain some  sort of

10  integrity to the way we came about this information.

11          This information is accurate.  It's reflected in

12  the PSR for the safety of Mr. Berry.  If Mr. Berry goes

13  into the Bureau of Prisons without being properly

14  classified, without the Bureau of Prisons being aware

15  that he is in fact a Columbia Point Dawg member -- he

16  is in numerous You Tube videos with many members of

17  Columbia Point Dawgs, calling out members of the

18  Orchard Park Street gang that they've had a very

19  violent back-and-forth warfare with for a decade -- he

20  is going to be at risk, he is going to be put in a

21  violent situation, and this is also the result of

22  Mr. Berry's actions, Mr. Berry's associations and what

23  Mr. Berry has put out into -- onto social media

24  numerous times.

25          So, it's very hard for the Government to walk

1    the fine line of trying to protect Mr. Berry while at

2    the same time being accused of fluffing up some gang

3    affiliation when Mr. Apfel knows perfectly well that's

4    not accurate.

5              THE COURT:  Thank you.

6              MR. APFEL:  Your Honor, may I respond?

7              THE COURT:  You may respond.

8              MR. APFEL:  I'm not suggesting that this is

9    fluffery on the part of Mr. Brown.  I said earlier that

10   Officer Brown I'm sure genuinely believes these

11   allegations, and for sure I have been in interviews or

12   I've been in meetings, more accurately, with Ms. Cannon

13   and Detective Brown in which Detective Brown has made

14   statements about Mr. Berry's affiliation with a gang.

15             I've never seen any evidence that he is a member

16   of this gang.  They have -- they can shout it to the

17   rooftops, but that's not evidence.  Statements,

18   conclusory statements, by Ms. Cannon or by Detective

19   Brown, those don't constitute proof.

20             THE COURT:  The standard for inclusion of

21   comments in a pre-sentence report is not that it be

22   admissible evidence, Mr. Apfel, at least that's my

23   understanding.  And, therefore, I'm going to overrule

24   your objection to No. 2.

25             Do you wish to address any other objections?

1        MR. APFEL:  I wish to address the objections

2   that are -- the package of objections that are 9, 10,

3   and 11.

4        THE COURT:  All right.  We'll deal with those.

5        Objection No. 9 objects to the scoring of a

6   prior conviction alleging that the Probation Officer

7   should have applied only two points, not three points,

8   to the conviction that is set forth in Paragraph 120 of

9   the pre-sentence report.

10        The Probation Officer responds by referencing

11   Application Note 2 of Sentencing Guidelines Section

12   4(a)1.2 as indicating that, for the purposes of

13   applying criminal history points, the length of a

14   sentence of imprisonment is the stated maximum.  Thus,

15   relative to this conviction in 120, the stated maximum

16   was one and a half years, a sentence of imprisonment of

17   one year to one and a half years, which is a sentence

18   of imprisonment in excess of one year and one month and

19   is what is used for purposes of criminal history

20   scoring.  The application note also specifies that

21   criminal history points are based on the sentence

22   pronounced, not the length of the time actually served.

23   Therefore, she declined to make any change.

24        How do you respond to her response?

25        MR. APFEL:  My response is that I believe she's

accurately stated the current state of the law.  I
would suggest, however, as a matter of simple fairness,
that this law should be re-thought.  And in this
particular case, Mr. Berry's sentence, it shouldn't be
scored as two points, it should be scored as zero
points because this was a sentence that, in reality, as
spelled out in more detail in my sentencing memorandum,
was a sentence that technically was one year to one and
a half years.

At the time the sentence was imposed, he was
given credit for 270 some-odd days that he had served
in connection with a different matter, and there was an
understanding, which became the reality, that he would
be given credit for those 271 days, he would serve out
the remainder of the low end of that sentence and
effectively have served a one-year sentence.  This is
in fact, as opposed to in theory, but in fact this was
a one-year sentence.

In fact, it was a 90-day sentence.  And in fact,
it was imposed more than ten years before the instant
crime is alleged to have commenced.  So, if it was a
sentence of one year -- if it was in fact a 90-day
sentence or a one-year sentence and it occurred within
the last ten years, then it should be scored as two
points.  But since it was more than ten years ago, it

1    should be scored as zero points.

2         THE COURT:  Does the Government wish to respond?

3         MS. CANNON:  No, Your Honor.  I think Probation

4    scored it accurately.  I think it's more appropriately

5    considered as a reason for a downward variance on the

6    sentence.

7         THE COURT:  Yeah, if I were to agree that it was

8    two points instead of three, that would reduce the

9    criminal history category from IV to III, as you argued

10   in your memorandum.  Then, of course the next argument

11   about the one point would not be a material -- make a

12   material difference because it would retain this

13   Defendant in Criminal History Category III; correct?

14        MR. APFEL:  That's correct, but if you were

15   to -- if you were to note it as zero points rather than

16   three points --

17        THE COURT:  Well, I don't see that there's any

18   grounds to note it as zero points.

19        MR. APFEL:  Except that, if the same ground for

20   moving it from three to two, if it is in fact moved

21   from three to two, given the staleness of the sentence,

22   given the age of the sentence --

23        THE COURT:  Well, I'll let Ms. Marcy address

24   that, if she wishes.

25        MR. APFEL:  -- it would be scored as zero, I

believe.

THE COURT: Ms. Marcy.

PROBATION OFFICER: Yes. If the Court were to consider this a one-year sentence, it would have been more than ten years ago, so it would receive zero points.

THE COURT: And if I agree with your original finding that the sentence was actually for one to one and a half years, then it's a felony or more than a year and a month; right?

PROBATION OFFICER: Right. And I think that, that is correct, and -- but I understand Counsel's argument to be more of like a variance grounds.

THE COURT: I agree with the Probation Officer and will overrule the objection, but I will take it into account when imposing sentence. That deals with Objection No. 9.

Objection No. 10 has to do with the next paragraph in the pre-sentence report, Paragraph 121, wherein the Defendant objects to the charge being treated as a prior sentence under the guidelines. The Probation Officer responds that Paragraph 121 accurately reflects what is specified on Court records that were provided to the Probation Office by Roxbury District Court, and those records were made available

1 apparently to Counsel, but he has not received them.

2 Do you wish to further address her response to

3 your objection, Mr. Apfel?

4 MR. APFEL: Yes, Your Honor. I have since

5 seen -- since the pre-sentence report was published and

6 the responses were published, Ms. Marcy graciously let

7 me look at the papers, and I did so a few days ago.

8 They accurately indicate that a -- that there is

9 a box checked that there was an admission to sufficient

10 facts, and a CWOF was entered. And so that is

11 different from the dismissal that was on the -- on

12 Mr. Berry's Board of Probation record that we received

13 in discovery.

14 But that having been said, I think as a

15 technical matter, again, as a matter of current law,

16 this would be properly scored as one point even though

17 there was no true sentence. He was never sentenced to

18 a term of imprisonment, he -- there was an entry of a

19 continued without a finding for a period of a year, and

20 then the case was dismissed after a year.

21 And the case itself substantively involved a

22 single joint, a single marijuana cigarette, a tiny

23 amount of marijuana that today in Massachusetts would

24 be legal. And I would suggest that, in light of the

25 change in the law, that this, even if it's considered

for criminal history purposes, the one point should not

be -- he should not be given a point, he should not be

given a point, and it should not be considered a

sentence, given that it was for an infraction, a

de minimis infraction that is no longer a violation of

law in this State.

THE COURT:  Well, I'm not going to retroactively

change a prior conviction, so I'm going to overrule

your objection to No. 10.

MR. APFEL:  I'll just say it's not a conviction,

Your Honor; it was a continuance.

THE COURT:  Continued without a finding.

MR. APFEL:  It was dismissed with --

THE COURT:  Though it's clearly a scored matter

and has been, as far as -- as long as I can remember,

so I believe the Probation Officer is correct in her

finding, and I'm not going to change it.  So, the

objection's overruled.

Objection No. 11 is a derivative objection based

upon the objections that we just dealt with, so I

overrule that as well.

And do I understand that Objection No. 12 is

basically a motion for a downward departure?

MR. APFEL:  That's correct, Your Honor.

THE COURT:  All right.  Then, I have dealt with

all of the objections.  We need to now establish the

appropriate Guidelines in this case.  Recommendations

in that regard are made for me starting on Page 33 of

the pre-sentence report, wherein the 2016 Guideline

Manual is deemed to be the appropriate one that we're

dealing with, and within that Manual, the

drug-trafficking Guideline 2D1.1 applies.

This Defendant is being held responsible for the

distribution of 395 grams of cocaine base, 3,819 grams

of heroin, 2,000 grams of cocaine, and 50.64 grams of

actual oxycodone.  When translated into marijuana

equivalency, that all totals 5,968.8 kilograms of

marijuana.  And because that figure falls between 3,000

and 10,000 kilograms, it calls for a base offense level

of 32.

Do Counsel agree with those calculations --

MS. CANNON:  Yes, Your Honor.

THE COURT:  -- Ms. Cannon, Mr. Apfel?

MR. APFEL:  Yes, Your Honor.

THE COURT:  The Court so finds.

Also, because the Defendant maintained a

premises at 76 Radcliffe Street for the purpose of

manufacturing or distributing controlled substance, a

two-level increase is warranted under the same

Guideline Subsection (b)12.

1          The Defendant is also entitled to a three-level

2    downward adjustment for his acceptance of

3    responsibility and, therefore, ends up with a total

4    offense level of 31.

5          Do Counsel agree with those calculations?

6          MS. CANNON:  Yes, Your Honor.

7          MR. APFEL:  Yes, Your Honor.

8          THE COURT:  The Court so finds.

9          Then, turning to the Defendant's criminal

10   history, there were prior convictions that are not

11   scored, five of them, but the conviction in 20 -- the

12   year 2000 for assault and battery with a dangerous

13   weapon and assault and battery, the Defendant gets

14   three criminal history points for that conviction.

15         And, as previously determined in overruling the

16   Defendant's objections, the Court finds that the

17   conviction in 2002 for assault by means of a dangerous

18   weapon is properly scored at three points and that the

19   conviction in 2008 for possession of marijuana was

20   properly scored at one point; and, therefore, the

21   Defendant ends up with seven criminal history points

22   and falls in Criminal History Category IV.

23         That means that, because the total offense level

24   is 31, Criminal History Category IV, the appropriate

25   Guideline range is 151 to 188 months.  I understand,

1  however, that the agreed-to binding plea calls for a

2  downward variance, so that the range of sentencing

3  before the Court is 120 months to 135 months.

4         I am thoroughly familiar with the arguments that

5  Counsel have made in their very thorough briefs, but I

6  will hear recommendations for sentencing, first from

7  the Government, Ms. Cannon.

8         MS. CANNON:  Thank you, Your Honor.

9         Your Honor, I do recognize that the Government

10  is asking the Court to vary downward from the Guideline

11  sentencing range of 151 to 188 months.

12         I have read Mr. Berry's sentencing memorandum,

13  as I know the Court has.  It's interesting in that he

14  talks about his growing up, and he talks about the

15  parents he had, or didn't have, he talks about where he

16  could have been if things were different, but then he

17  went to lead a life that was not just similar to that

18  in which he was raised but created a worse life for his

19  four children.  He -- they write beautiful letters

20  talking about how much they love their dad, as they

21  should.

22         Again, this investigation went on for a very

23  long time, and other than Mr. Berry living with his old

24  est son who he would frequently pull out of school or

25  ask to go home to serve drug customers who were waiting

for Mr. Berry to get out of his legitimate job, the
Government didn't see a whole lot of fathering by
Mr. Berry.  We were aware of his relationships with
different women, we were aware that he had many kids,
we certainly were aware of the fact that Mr. Berry had
a gentleness to him when he spoke with his children and
was capable of being the kind of father that they
deserve, but Mr. Berry certainly was not that father,
as depicted in these letters.

It's for that reason that the Government feels
that a sentence of -- it's not for that reason, but
it's one of the factors the Government has looked at
when they -- when we've decided that a sentence of
135 months is an appropriate sentence.

Mr. Berry is capable of a law-abiding life, he
is capable of being a provider for his children, he is
capable of being a provider for his community, he is
capable of taking care of his grandmother who has taken
care of not just her family but also the community at
large in the work that she's done both prior to her
employment with the Federal Government but also I
believe she was a member of the Peace Corps.  He has
these people in his life, and he, among all of his
relatives who are part of this case, is capable of that
similar life.

1       However, Mr. Berry instead chose, and chose

2   repeatedly, as demonstrated by his criminal history, to

3   supply an already impoverished area of Boston with

4   every kind of drug imaginable, heroin, cocaine, cocaine

5   base, oxycodone.  He used one of his sons to assist him

6   in his business.  He deserves a sentence of 135 months.

7   It's the right sentence.

8       I realize that is a sentence below his Guideline

9   range.  The people in -- and when the Government's

10  trying to sentence this case, we were looking at 55

11  individuals or 55 different criminal backgrounds, 55

12  different roles in this offense.  Some were larger

13  providers of -- larger scale providers of heroin and

14  cocaine than Mr. Berry; some were much lower or

15  street-level re-distributors; some had, as Mr. Person

16  who was in front of Your Honor, have lengthy criminal

17  histories and are career offenders, however, they're

18  not necessarily drug suppliers of Mr. Berry.

19      So, it's a very hard balancing act to make sure

20  that Mr. Berry -- that the Government is recommending a

21  fair and just sentence for Mr. Berry that keeps him in

22  parody with everyone else.  That's where the 135-month

23  recommendation comes in.  The individuals who are

24  falling from 151 months to 188 months are all

25  individuals who are not just charged with

1    drug-trafficking in the amounts that Mr. Berry is

2    charged with but also charged in the racketeering

3    indictment in front of Judge Stearns, so there's

4    elements of violence for all of them that is pulling

5    their sentences into this 151 to 188 range and some

6    even higher.

7         We don't consider Mr. Berry warranting that type

8    of sentence because he wasn't involved, in this

9    investigation, in that type of violence.  Therefore,

10   the Government's recommendation is coming down about

11   15 months, which is significant but not as large as

12   some of the variances that have come out of the

13   sentencing, again, across five separate indictments in

14   this case.

15        Mr. Berry is -- if he receives a sentence of

16   135 months, it is the most significant sentence handed

17   down to date, it's the most significant sentence by

18   31 months in front of Your Honor, and it does reflect

19   the role Mr. Berry played in this offense.  It does --

20   it is a huge sentence for somebody with Mr. Berry's

21   criminal history and time that he spent committed

22   before.  It's a huge sentence for somebody who's been

23   distributing drugs and distributing this quantity of

24   drugs, particularly in the Dorchester neighborhood of

25   Boston.

1    But it's an appropriate sentence.  It doesn't

2 need to be greater than 135 months for Mr. Berry to

3 understand the impact of what it was he did, not just

4 to himself, not just to his family, but also to his

5 community.

6    I believe that the Court should adopt this plea

7 agreement.  I think it's the right sentencing range for

8 Mr. Berry, not just for Mr. Berry as an individual, but

9 for Mr. Berry in the context of this investigation and

10 for Mr. Berry in the context of the indictment in front

11 of Your Honor.  And I would urge the Court to adopt the

12 Government's recommendation of 135 months.

13    THE COURT:  All right.  Thank you.

14    Mr. Apfel.

15    MR. APFEL:  Your Honor, as you know from the

16 papers, our recommendation is a 120-month sentence.  As

17 you've also seen, Mr. Berry has enormous support from

18 his family, from friends.  Some family members and

19 friends are in the Courtroom.  His grandmother is there

20 in the back of the Courtroom, his mom is in the back of

21 the Courtroom, his friend Tasha Graham is in the

22 Courtroom, and a number of other friends are here as

23 well.

24    He has received -- Your Honor has seen the

25 letters from his children, not just from his own four

children, Ray, Treshone, Kaylin and Uniqunek, but also from Tysha Duntin's other two children who Mr. Berry helped raise, Shaquiell and Jaquan. Those are not cookie-cutter letters. Those are letters from the heart. Those letters speak to a relationship that all six of those children have had over a long period of time with their father and speak to the love and affection that they feel for their father, which is clearly and obviously and palpably reciprocated, which I see every time I speak to Mr. Berry.

Ms. Cannon says that the Government didn't see a lot of fathering. Frankly, the Government wasn't looking for a lot of fathering. The Government, you know, was investigating the drug crime. They found evidence of a drug crime. We're not disputing that. But they're not in his life and never were in his life 24 hours a day and didn't see the relationship day in and day out that he had not just with his own kids but with Tysha Duntin's other kids.

He is -- he clearly had -- and I'm not going to repeat what is in the papers -- a very hard childhood. He has suffered from drug abuse at times. He has suffered from mental illness, which the Government doesn't comment on. He has been diagnosed with bipolar disorder, he's been diagnosed with depression. He's

1   never received any treatment for any of these serious

2   mental illnesses that he suffers from and has suffered

3   from in the past.

4        To be sure, he has committed crimes, he's

5   committed serious crimes.  He has acknowledged his

6   wrongdoing.  He's stood up, he's taken responsibility

7   for what he did.  He made bad decisions involving his

8   adult son Ray periodically, as Ms. Cannon says, when he

9   was not home, to allow people into the house and the

10  like.  But as Ray himself says and as Mr. Berry has

11  indicated, Ray has never been in trouble with the law,

12  and the lessons that Mr. Berry was teaching Ray in the

13  23 hours, 59 minutes and 59 seconds every day that he

14  wasn't involved in the drug business with him at all

15  were lessons to teach his son to stay out of trouble,

16  to abide by the law, which his son has done, to his

17  credit, in a very difficult environment.

18       I have noted for Your Honor that the -- I'm not

19  going to repeat the arguments with respect to the

20  Guidelines.  I believe, properly calculated, that the

21  Guideline -- that Mr. Berry's criminal history category

22  should be -- he should receive no more than three

23  criminal history category points for the reasons I

24  attempted unpersuasively to articulate earlier and

25  tried to articulate in my papers.  I understand

1  Your Honor has rejected that as a matter of law.  We

2  stand on the legal notion that his criminal history

3  category should be no worse than II.  If it were no

4  worse than II, then his sentencing range would be 121

5  to 151 months.  If it was lower than II, obviously,

6  120, it would be squarely within the range, but that

7  even said, 120 is just one month below what we believe

8  to be the range, as properly calculated.

9       To the extent that you have, and you obviously

10 have rejected our arguments with respect to his

11 criminal history category, I would ask that you

12 consider those same arguments, as you suggested you

13 would, in thinking about where he should be -- where he

14 should be placed, whether or not his criminal history

15 category truly reflects his criminality or the

16 likelihood that he'll commit other offenses.  I would

17 suggest, Your Honor, that it doesn't, that it really

18 grossly inflates the risk that this man poses and

19 inflates his criminal history category.

20      I mean, if nothing else, the -- I understand the

21 argument, and it may well be, under current law,

22 correct as a matter of law that he should receive one

23 point for having admitted to sufficient facts for

24 possessing a single joint of marijuana, but the fact

25 that, that admission, which doesn't bring with it any

1   conviction, which is ultimately dismissed, results in a

2   bump in his criminal history category from III to IV

3   and an additional exposure at the low end of 16 months,

4   an additional exposure at the high end of the range of

5   20 months is, frankly, to my way of thinking at least,

6   absurd, especially in light of the fact that, today in

7   Massachusetts, possession of that amount of marijuana

8   is perfectly legal.  In fact, people are allowed to

9   grow far more than that in their own homes.

10          There are two main reasons that I would argue

11   that Mr. Berry should receive a sentence of 120 months,

12   rather than the 135 urged by the Government.  The first

13   reason is to avoid the unwarranted disparity with other

14   Defendants who've been sentenced in drug-trafficking

15   offenses in this District as well as nationwide, and

16   we've given you the statistics in our papers.  This

17   sentence is far above the District and the national

18   averages.  But more importantly and more pointedly, a

19   sentence of greater than 120 months for Mr. Berry,

20   notwithstanding Ms. Cannon's arguments to the contrary,

21   would work a real injustice in comparison to the

22   sentences that Mr. Berry's co-Defendants and the

23   Defendants in related cases have received.

24          The 24 -- there are 24 individuals who have been

25   sentenced to date.  Only one has received a sentence of

120 months.  No one has received a higher sentence.
There are 15 individuals who have received sentences
between five and ten years and eight individuals below
five years.  Mr. Berry, I mean, there's no rhyme or
reason and no justice and no fairness separating
Mr. Berry from this group that has been sentenced to
date.

I mean, the Government says that he -- in its
papers, they say he's the most culpable.  On Page 8 of
their papers, they say he's the most culpable of the
nine individuals who are part of his indictment.  They
don't mention the other indictments, but they say his
indictment, and then remarkably, two sentences later,
when you flip over to Page 9, they say they don't mean
to suggest even for a moment that he's as culpable as
Francisco -- he's moving -- he's moving kilograms of
heroin, they don't mean to suggest that he's moving
kilograms of heroin, like his co-Defendants in this
case, Francisco Arias and David Coke.  And yet somehow,
because they're not suggesting that he's moving
kilograms of cocaine, he's still on some -- for some
way -- in some way more culpable?  It doesn't make
sense, and I would suggest, Your Honor, the record does
not support him being more culpable.

The Government points to David Jones, an

individual who is not a co-Defendant but was a
Defendant in a related case who is the one individual
in the group of what the Government has labeled the
Columbia Point Dawg cases that has received a 120-month
sentence, and the Government points to him and says
that he is most similarly situated to Mr. Berry.  And
yet Mr. Jones, Mr. Jones was a career offender, unlike
Mr. Berry.  Mr. Jones's Guideline sentencing range was
not 151 to 188 months.  Mr. Jones's Guideline
sentencing range, by virtue of him being a career
offender, was 262 to 327 months, and yet he received a
variance, a downward variance, of 142 months from the
low end of his sentencing range and well more than that
if you consider the, you know, the potential sentence
up to 327 months.

        We are asking for what, frankly, I believe is
very close to at most one month off of a Guideline
sentence, but even if the Guidelines are properly
calculated by Probation and as accepted by Your Honor
and 151 months is the low end, we're asking for a
variance of 31 months, as compared to the variance for
David Jones who, in the Government's words, is most
similarly situated to Mr. Berry who received a downward
variance of at least 142 months.  It pales in
comparison.

1    Desmond Person was also a career offender who

2 Your Honor sentenced.  His Guideline sentencing range

3 as a career offender was, likewise, 262 to 327 months.

4 The Government says that his culpability was not as

5 great, but even so, under the Guidelines, there was a

6 variance given to him from his Guideline sentence of

7 well over 150 months.  He received a sentence of

8 104 months.  And he's the person who's received the

9 second highest sentence of the group of so-called

10 Columbia Point Dawg Defendants.

11    I don't think there is any basis in fairness or

12 justice for Mr. Berry receiving a sentence of greater

13 than 120 months, and I would suggest that any such

14 sentence would work a real gross disparity and

15 injustice when compared to David Jones' sentence,

16 Desmond Person's sentence and the sentences of the

17 other individuals in this group of cases.

18    The second package of reasons, Your Honor, that

19 I would suggest that a 120-month sentence and not a

20 135-month sentence is appropriate is because it is

21 sufficient and not greater than necessary within the

22 meaning of 3553(a) for this man under these

23 circumstances.  The Government says he doesn't need

24 more than 135 months, but they don't even attempt to

25 argue nor could they argue for why he needs, why it's

1   necessary for him to receive 135-months, as opposed to

2   120 months.  I would suggest, Your Honor, that you look

3   at all of the purposes of sentencing as set forth in

4   3553(a)(2), and all of them comply with a sentence of

5   120 months being sufficient and not greater than

6   necessary for this Defendant.

7        And I'll just tick them off quickly.  The first

8   purpose of sentencing, receiving a just punishment for

9   the crime.  However you slice it, this is a hefty

10  sentence.  Promoting respect for the law, part of that

11  same purpose, combined with the just punishment, I

12  would suggest, Your Honor, that a higher sentence,

13  especially given the sentences that similarly situated

14  Defendants in this very case, David Jones in

15  particular, has received, that a sentence for Mr. Berry

16  of more than 120 months would promote, if anything,

17  disrespect for the law rather than promote respect for

18  the law.

19       The second purpose, the deterrence, whether you

20  view it as specific deterrence or general deterrence,

21  as a specific matter, Mr. Berry clearly gets it.  He

22  has owned up to his crime, he's acknowledged his crime,

23  he's committed to leading a different and a better and

24  a crime-free life.  And, you know, our hope is that,

25  once he receives the treatment that he's never received

1    in his life, he'll be in a position to really do that.

2    But there's no -- there's really no question, by virtue

3    of his age alone, but putting aside his age, how he's

4    behaved in prison, the perfect prison record that he's

5    had over the past two years, his commitment to being

6    employed while being in prison, maintaining a job in

7    prison, all shows that this is a person who is not

8    about to return to a life of crime.

9            Generally speaking, as a matter of general

10   deterrence, I would suggest that for other would-be

11   drug-traffickers in Dorchester or Roxbury or elsewhere,

12   the difference between 120 months and 135 months is

13   probably a distinction without a difference and that,

14   if 120 months is not going to deter others, 135 months

15   is not going to deter others.  On the other hand, I

16   would suggest, Your Honor, that 120 months and that

17   difference of 15 months would make an enormous

18   difference in this man's life because those 15 months

19   are 15 months that he can be with his kids, be with his

20   family who are waiting anxiously for him to return from

21   prison.

22           In terms of protecting the community, which is

23   the third purpose, I would suggest that, again, his

24   age, the fact that he'll be in his high 40s by the time

25   he ends this sentence suggests that there is very

1    little likelihood, just as a demographic matter, that

2    he's going to return to a life of crime.  But

3    independent of that, he has demonstrated I think over

4    the past two years and through his plea in this case

5    that he is -- he's not somebody who poses a danger to

6    others.

7         And finally, you know, the fourth purpose

8    delineated in this 3553(a)(2); namely, rehabilitation

9    and the programs, the mental illness programs, the

10    drug-abuse programs that would be available in prison,

11    these are exactly the programs that Mr. Berry has

12    needed years and years ago.  And I would suggest that

13    having those programs available, which he can readily

14    complete within a ten-year sentence without the need

15    for the additional 15 months, will serve him well and

16    will put him in a position to return to the community

17    as the father that he is and as a real citizen.

18         So, for all of those reasons, Your Honor, I

19    would ask that the Court impose a sentence of

20    120 months, which is sufficient and certainly no more

21    than necessary to comply with the purposes of

22    sentencing.

23         THE COURT:  Does the Defendant wish to address

24    the Court before sentence is imposed?

25         THE DEFENDANT:  Yes, Your Honor.

1    THE COURT:  You may do so.

2    THE DEFENDANT:  Thank you, Your Honorable Judge

3 Gorton.  I would just like to apologize to my kids, my

4 family members as well as friends, my girlfriend Tysha,

5 and I regret my -- I regret what I did in the past, but

6 I'm just looking forward to a brighter future, and I'd

7 like to apologize to you too and the people of the

8 Court.  And that's pretty much it.

9    THE COURT:  All right.  Thank you.

10    Do Counsel know of any reason why sentence ought

11 not to be imposed at this time?

12    MS. CANNON:  No, Your Honor.

13    MR. APFEL:  No, Your Honor.

14    THE COURT:  Then, please stand, Mr. Berry.

15    You have played a major role in a massive

16 drug-trafficking organization that has spread deadly

17 drugs throughout the Boston community.  In this

18 particular offense, you personally are responsible for

19 the distribution of nearly two kilograms of heroin, one

20 kilogram of powder cocaine and lesser amounts of crack

21 cocaine and oxycodone, surely enough illegal drugs to

22 contribute significantly to the drug addiction of

23 countless vulnerable victims and the ruination of

24 lives.  For that alone, you deserve a substantial jail

25 sentence if for no other reason than to assure that, at

1   least while you're incarcerated, you won't be spreading

2   more poison in our midst.

3        I believe you are fortunate to have had very

4   competent Counsel negotiate a binding plea agreement

5   for a sentence below the applicable Guideline

6   sentencing range because there appears to be no reason

7   apparent to this judicial officer of why you are

8   deserving of a sentence below the applicable Guideline

9   range other than the Government's conclusion that such

10  a downward variance is warranted to keep parity among

11  the co-Defendants in this and other related cases.  For

12  this heinous drug-trafficking crime, I need not only to

13  deter you personally from ever committing a similar

14  offense but also to deter any other drug dealers who

15  think that he or she can commit such life-threatening

16  crimes without facing in excess of ten years in prison.

17       Pursuant to the Sentencing Reform Act of

18  1984, and having considered the sentencing factors

19  enumerated in Title 18 of the United States Code,

20  Section 3553(a), it is the judgment of this Court

21  that you, Willie Berry, are hereby committed to the

22  custody of the Bureau of Prisons to be imprisoned

23  for a term of 132 months.  The Court recommends

24  participation in the Bureau of Prisons' residential

25  drug-abuse program due to your substance abuse history

and based on an informal pre-screening performed by the Probation Office.

The Court recommends that you complete the residential drug abuse program, RDAP, and you are to be considered for that for the Bureau of Prisons' alternative community placement program, allowing you to transition to a treatment setting as an alternative to a residential re-entry center prior to release.

Upon release from imprisonment, you shall be placed on supervised release for a term of five years. Within 72 hours of release from custody of the Bureau of Prisons, you shall report in person to the district to which you are released.

No fine is imposed, as it is deemed that you do not have the financial ability to pay a fine.

The Court grants the United States' motion for entry of a preliminary order of forfeiture. The Court finds that the United States has established the requisite nexus between this property and the offense to which -- for which you have been convicted.

While under the Probation Office's supervision, you shall comply with the following terms and conditions: First, you are not to commit another Federal, state or local crime, and are you not to unlawfully to possess a controlled substance. You must

1  refrain from any unlawful use of a controlled substance

2  and submit to one drug test within 15 days of release

3  from imprisonment and at least two periodic drug tests

4  thereafter, not to exceed 50 tests per year.

5  You must cooperate with the collection of a DNA

6  sample, as directed by the Probation Office, and you

7  are to comply with the standard conditions that have

8  been adopted by this Court and are described in the

9  Sentencing Guidelines at Section 5D1.3(c) and which

10  will be set forth in detail in the judgment and

11  committal.

12  You are to participate in a program for

13  substance abuse counseling, as directed by the

14  Probation Office, which program may include testing,

15  not to exceed 50 drug tests per year, to determine

16  whether you have reverted to the use of alcohol or

17  drugs.

18  You are to participate in an educational

19  services program, as directed by the Probation Office.

20  That program may include GED preparation, English as a

21  second language classes and/or other classes designed

22  to improve your proficiency in skills such as reading,

23  writing, mathematics and computer use.

24  You are to use your true name and are prohibited

25  from the use of any false identifying information,

1    which includes but is not limited to any aliases, false

2    dates of birth, false social security numbers and

3    incorrect places of birth.

4        You are required to contribute to the costs of

5    the evaluation and treatment programming and/or

6    monitoring that has previously been imposed based upon

7    your ability to pay or the availability of third-party

8    payment.

9        It is further ordered that you shall pay to the

10   United States a special assessment of $100, which shall

11   be due and payable immediately.

12       Under your (c) plea, you have waived your rights

13   to appeal, but to the extent that you have any

14   remaining rights to appeal, you must exercise those

15   rights within 14 days; do you understand that?

16       THE DEFENDANT:  Yes, Your Honor.

17       THE COURT:  Is there any further business to

18   come before the Court in these proceedings?

19       MS. CANNON:  No, Your Honor.  Thank you.

20       MR. APFEL:  Two quick things, Your Honor.  One,

21   I would ask that the judgment make clear that Mr. Berry

22   receive credit on his sentence for all time served

23   since his arrest and his detention, which I believe --

24   Probation will correct me if I'm wrong -- was June 18

25   of 2015.

```
1         THE COURT:  Ms. Marcy?

2         PROBATION OFFICER:  Yes, Your Honor, June 18 to

3    present.

4         THE COURT:  June 18 of 2016?

5         PROBATION OFFICER:  I'm sorry.  2015.

6         THE COURT:  2015?

7         MR. APFEL:  2015.

8         THE COURT:  He'll receive such credit.

9         Anything further?

10        MR. APFEL:  Thank you, Your Honor.

11        The one other thing I would request is that

12   you -- I know it's not binding on the Bureau of

13   Prisons, but if Your Honor could make a judicial

14   recommendation that Mr. Berry be placed at Fort Devens

15   or whatever other facility has suitable programs as

16   close to Boston as possible.

17        THE COURT:  Well, I'll recommend that he be

18   placed in a Bureau of Prisons facility closest to

19   Boston at the appropriate security level, which I am

20   sure is not Fort Devens, but he'll have that

21   recommendation.

22        We're adjourned.

23        MR. APFEL:  Thank you.

24        MS. CANNON:  Thank you.

25        THE CLERK:  All rise.  The Defendant is
```

1    remanded.

2             (Adjourned, 4:08 p.m.)

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9         I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes in the

12   above-entitled case.

13

14

15

16

17

18              /s/ Debra D. Lajoie

19

20

21

22

23              7/5/17

24

25